J-A16011-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| JOHN R. FREY, H. ELAINE FREY, ROBERT G. FREY, SUE FREY, JAMES MILLER, AND ROBIN MILLER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| BONNY GOLD, DENNIS GOLD, SLURRY TECHNOLOGIES OPERATING, LLC, SLURRY TECHNOLOGIES OPERATING, INC., PILGRIM ENERGY COMPANY, PILGRIM COAL COMPANY, CHARLES MUSE, A.C. MUSE, ENSUM PARTNERSHIP NO. 2, SLURRY TECHNOLOGIES, INC., AGGREGATE SOLUTIONS, INC., ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES H. MUSE, JR., DECEASED, ALBERT C. MUSE/REPRESENTATIVE OF THE ESTATE OF CHARLES HOWARD MUSE, JR. | |
| APPEAL OF: BONNY GOLD, DENNIS GOLD AND SLURRY TECHNOLOGIES OPERATING, LLC | No. 1158 WDA 2016 |

Appeal from the Judgment Entered July 6, 2016
In the Court of Common Pleas of Venango County
Civil Division at No: 2002-00232

BEFORE: , STABILE, J., FORD ELLIOTT, P.J.E. and STRASSBURGER,[*] J.

MEMORANDUM BY STABILE, J.: FILED OCTOBER 20, 2017

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellants, Bonny Gold, Dennis Gold, and Slurry Technologies Operating, Inc (collectively, "Appellants"), appeal from the July 6, 2016 judgment in favor of Appellees John R. Frey, Elaine Frey, Robert G. Frey, James Miller, and Robin Miller. We affirm.

The trial court's opinion, which we quoted at length in the companion case (1120 WDA 2016) sets forth the relevant facts and procedural history. At this docket number, Appellants challenge the trial court's discovery sanctions. The trial court issued a series of sanctions against Appellants during the course of this litigation, culminating in an order preventing Appellants from contesting liability. As set forth at docket number 1120 of 2016, the jury returned a substantial award of damages in favor of Appellees. Here, Appellants challenge several of the trial court's pre-trial orders imposing discovery sanctions.

In essence, Appellants argue that they consistently attempted to comply with Appellees' discovery requests; that certain documents were never in their possession and that Appellees were aware of that fact; and that the trial court's various sanctions against them were excessive and not warranted under applicable law. Before its final sanction—precluding Appellants from contesting liability—the trial court conducted a lengthy hearing, after which it rejected the factual bases for Appellants' arguments. In particular, the trial court found that the "Gold Defendants have attempted numerous times to fabricate documents or utilize documents already in existence in order to

prove they have purged themselves of contempt." Trial Court Opinion, 10/7/16, at 21. In essence, the trial court concluded that Appellants were dishonest, and that they led Appellees on a wild goose chase throughout years of unnecessarily protracted discovery.

We recognize that appellate review of an order terminating litigation for discovery sanctions is "stringent." Cove Centre, Inc. v. Westhafer Const., Inc., 965 A.2d 259, 261 (Pa. Super. 2009).

> Generally, imposition of sanctions for a party's failure to comply with discovery is subject to the discretion of the trial court as is the severity of the sanctions imposed. Nevertheless, the court's discretion is not unfettered; since dismissal is the most severe sanction, it should be imposed only in extreme circumstances, and a trial court is required to balance the equities carefully and dismiss only where the violation of the discovery rules is willful and the opposing party has been prejudiced. Consequently, where a discovery sanction either terminates the action directly or would result in its termination by operation of law, the court must consider multiple factors balanced together with the necessity of the sanction.
>
> Mindful, of course, that each factor represents a necessary consideration and not a necessary prerequisite, this Court has outlined the following factors:
>
>> (1) the nature and severity of the discovery violation;
>>
>> (2) the defaulting party's willfulness or bad faith;
>>
>> (3) prejudice to the opposing party;
>>
>> (4) the ability to cure the prejudice; and
>>
>> (5) the importance of the precluded evidence in light of the failure to comply.

Id.

- 3 -

We have reviewed the record, the applicable law, the trial court's opinions and the parties' briefs. We conclude that the trial court's opinions of October 7, 2016, at pages 27-35, and the trial court's entire opinion of November 26, 2012, thoroughly analyze the applicable law and the evidence of record. We affirm the judgment on the basis of those opinions, and order that a copy of each be filed along with this memorandum.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  10/20/2017

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA
CIVIL DIVISION – LAW AND EQUITY

JOHN R. FREY and H. ELAINE FREY,  :
husband and wife; and G. ROBERT and SUE  :
FREY, husband and wife,  :
      Plaintiff/Counterclaim  :
      Defendants,  :
  :
      v.  :
  :
BONNY GOLD and DENNIS GOLD, husband  :
and wife; SLURRY TECHNOLOGIES  :
OPERATING, LLC; SLURRY  :
TECHNOLOGIES OPERATING, INC. now  :
known as AGGREGATE SOLUTIONS, INC.;  :
PILGRIM ENERGY COMPANY f/k/a  :
PILGRIM COAL COMPANY; CHARLES A.  :
MUSE, JR. individually; ALBERT C. MUSE,  :
individually; CHARLES A. MUSE, JR. and  :  CIV. NO. 232-2002
ALBERT C. MUSE trading as ESUM  :
PARTNERSHIP NO. 2; and SLURRY  :
TECHNOLOGIES, INC.,  :
      Defendants,  :
  :
      v.  :
  :
JAMES and ROBIN FREY MILLER,  :
      Additional Counterclaim  :
      Defendants.  :

## OPINION OF COURT

AND NOW, this 26th day of November, 2012, this Court has for consideration the

Motion to Enforce Contempt, for Additional Sanctions and for Attorney Fees filed on behalf of

the Plaintiffs. Argument and an evidentiary hearing was held thereon at which time the Plaintiffs

were present and represented by Steven Petrikis, Esquire. The Gold Defendants were present

and self- represented. The Muse Defendants were represented by Jonathon Babyak, Esquire.

The Plaintiffs commenced the original action, filing the Complaint on December 11, 2002.

The first Motion for Sanctions filed by Plaintiff was on December 27, 2007 where the Court

C

ordered the Gold Defendants to serve "full and complete" answers to the Interrogatories, to serve a response to the Request for Productions of Documents and to make fifteen boxes of documents available to the Plaintiffs on or before January 25, 2008. The Gold Defendants failed to comply with this Order. Plaintiffs filed a second Motion for Sanctions on December 2, 2008 where the Court again ordered Gold Defendants to comply with the same requirements as before, this time with a deadline of March 2, 2009. The Gold Defendants were also advised that if full and complete responses were not served, and documents not made available by the specified date, the Court would issue appropriate sanctions. Again, the Gold Defendants failed to comply with the Order.

Plaintiffs filed another Motion for Sanctions to all Gold Defendants and a Motion to Compel on all Defendants on April 19, 2010. The Court yet again ordered the Gold Defendants to file a response to Plaintiff's Request for Production of Documents and Interrogatories and make available all documents as previously ordered. Still, the Gold Defendants failed to comply. Plaintiffs then filed a Motion to Hold Defendants Dennis and Bonny Gold in Contempt, and Motion for Attorney Fees. Following argument, the Court issued an Opinion and Order of Court finding the Gold Defendants in contempt and allowed them to purge themselves by providing copies of certain specified documents and paying attorney's fees in the amount of $1,000.

Currently before the Court is Plaintiffs' Motion to Enforce Contempt, for Additional Sanctions and for Attorney Fees. As hereinbefore stated, the Court originally held argument on the matter. During argument, Plaintiffs asserted that despite clear and unequivocal Court Orders to provide discovery which they have evaded for nearly five years, the Gold Defendants persist in failing to produce documents critical to Plaintiffs prosecution of the damages case. Plaintiffs argued that while it appears that the Gold Defendant's complied with the previous Court Order, a

majority of the documents in the four boxes were documents that they produced to the Gold Defendants. As a result, Plaintiffs explain that the Gold Defendants now purport to not have most of the documents including, the Hanson Documents, STO Ledgers and Bank Statements, STO Receipts and Payments, STO Billings and Receivables, Value Calculations and the tape of the May 16, 2002 meeting. Plaintiffs claimed that the discovery violations in the case have been repetitive, willful, prejudicial and designed to harm the Plaintiffs and to cause Plaintiffs to incur unnecessary expenses, fees and time in pursuing discovery information which either never was in the Golds' possession or was destroyed. Plaintiffs are requesting default judgment, evidence preclusion, factual findings and payment of attorney fees.

In response, the Gold Defendants argued that they have complied with the Court Order dated March 29, 2011 that required them to copy and provide at their own cost all documents requested in discovery. They alleged that it has been Plaintiffs' counsel that has in fact been causing the wanton and deliberate delay. The Gold Defendants claimed that Exhibit E to their Response/Brief in Opposition of Motion for Sanctions will show that the Gold Defendants did produce to the best of their ability the documents requested by the March 29, 2011 Order and actually went above and beyond by even organizing and labeling the documents to correspond with the questions. Mr. Gold also claims that he provided the tape that was requested. They further argued in their Proposed Findings of Fact and Memorandum of Law, filed July 30, 2012, that up until the March 29, 2011 Order, they were never ordered to produce those specific documents as the previous four Court Orders did not contain the word "invoice" or "audit" but only used the term "document." They request that the Court re-instate their counterclaims and affirmative defenses, impose sanctions against the Plaintiffs for the intentional exploitation of their pro se status and delay of the whole trial process, and order the Plaintiffs to pay the costs of

$14,850 associated with the unnecessarily extended discovery process and production of documents.

Following argument on the instant Motion and due to the gravity of the allegations raised, the Court held an evidentiary hearing on said Motion providing all parties an opportunity to present any evidence on what, if any, sanctions the Court could impose based upon the findings of contempt and noncompliance. Following the hearing, the Court ordered all parties to file Memoranda of Law thirty (30) days following the completion of the transcripts of the hearing. The Court received the Plaintiffs' Proposed Findings of Fact and Memorandum of Law for Plaintiffs' Motion to Enforce Contempt, for Additional Sanctions and for Attorney Fees on July 23, 2012, Defendants Gold's Proposed Findings of Fact and Memorandum of Law Demonstrating Defendants Gold Have Purged Themselves of Contempt of the Court's 3/29/12 Discovery Order and That Plaintiff's Motion for Additional Sanctions for Attorneys Fees Should be Refused on July 30, 2012, Muse Defendants' Proposed Findings of Fact and Memorandum of Law for Plaintiffs' Motion to Enforce Contempt, for Additional Sanctions and Attorney's Fees filed on August 1, 2012 and finally Plaintiffs' Response to Defendants Gold's Proposed Findings of Fact and Memorandum of Law filed on August 14, 2012. Based on the evidence, testimony, and the record, the Court makes the following Findings of Fact.

On April 13, 2011, as a result of the March 29, 2011 Order of Court, the Gold Defendants forwarded via Federal Express a letter, a check for $1,000.00 and four large boxes of documents. Upon review of the documents, both by Plaintiffs' counsel and the Plaintiffs, it appeared that a large amount of the documents produced in those four boxes were in fact documents that the Plaintiffs had previously produced to the Gold Defendants and that none of the documents were those ordered to be produced. Plaintiffs prepared an index of the documents produced when they

reviewed the boxes, which was admitted into evidence during the evidentiary hearing. Following review of the documents contained in the boxes, Plaintiffs' attorney advised Mr. Gold, via letter dated July 12, 2011, that he had failed to purge himself of contempt and that he was providing Mr. Gold with an additional ten days to comply. Mr. Gold then responded via letter dated July 28, 2011 stating that he had sent a second April 13, 2011 letter that did comply with the March 29, 2011 Order of Court. On October 17, 2011, Mr. and Mrs. Gold filed a verified response to the Motion to Enforce Contempt, entitled Response/Brief in Opposition of Motion for Sanctions. The Gold Defendants testified as to the existence of the second April 13, 2011 letter and indicated that it was attached as Exhibit E. However, there was no Exhibit E attached to the response and none was ever produced either at the argument or at the hearing. Eventually, during the April 9th, 2012 hearing, Mr. Gold admitted that there was no second April 13, 2011. In a later letter sent in October of 2011, Gold Defendants asserted that the documents that they had been ordered to produce were designated by "blue sheet" dividers with writing explaining what documents followed. The Gold Defendants attempted to prove this via their son's testimony and the testimony of Ashley Baker during the evidentiary hearing. This assertion is in contradiction to the July 28, 2011 letter stating that the "second" April 13, 2011 letter did the same thing. During the evidentiary hearing, Mr. Gold testified that the Answer to the Frey Parties' first set of interrogatories and request for production of documents was the "second" April 13, 2011 letter he had previously asserted had complied with the Court's Order directing them to label documents which provided answers to Interrogatories 1, 3, 5. However, when questioned further, Mr. Gold admitted that specific Answer was verified and prepared in 2010, before the most recent Court Order directing him to clearly identify the documents when produced. Next the Gold Defendants asserted at the first evidentiary hearing that they forwarded a July 20, 2011

letter to Plaintiff's counsel that complied with the March 29, 2011 Order, which offered Plaintiffs an opportunity to meet. However, when pressed further about the letter, Mr. Gold stated that it had never actually been sent and instead was redrafted by an attorney and was essentially the July 28, 2011 letter allegedly containing similar content, that was sent to Plaintiff's counsel. However, the July 28, 2011 letter relies wholly upon the now established as never existent "second" April 13, 2011. After review of the document during testimony at the evidentiary hearings, the content was not substantially similar. In all, Gold Defendants have attempted numerous times to fabricate documents or utilize documents already in existence in an effort to prove they have purged themselves of contempt. The Gold Defendants have to this day failed to produce any documents relating to the stock value determination of $7.64 per share, despite Mr. Gold testifying at his deposition that he prepared the computations, have failed to produce STO's billings and receivables and STO receipts and payment, have failed to produce general ledgers and bank statements and have failed to produce the Hanson invoices, including audit information, after Defendant Charles Muse, in his deposition, confirmed that the documents did exist and that they were prepared in Franklin, Pennsylvania, where Mr. Gold performed his work for the Muse Defendants.

Prior to the March 29, 2011 Order, the Gold Defendants and Plaintiffs' counsel had repeatedly corresponded directly regarding the documents ordered to be produced. By letter dated March 12, 2009, Plaintiffs' counsel wrote to the Gold Defendants "To the extent these documents are not in your possession, please so advise." In a written response, the Gold Defendants did not so advise but instead stated that counsel should "bring a flashlight, and a generator" to review thirty boxes in an unlit storage facility. At no time, prior to the current Motion did the Gold Defendants assert that they do not have the documents and it is not clear

from the record whether they assert that these documents never existed, were lost, were destroyed or are simply not being produced.

A Court may, as authorized by the Pennsylvania Rules of Civil Procedure, make an appropriate order for sanctions if:

> (a)(vii) a party, in response to a request for production or inspection made under Rule 4009, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested;
>
> (vii) a party or person otherwise fails to make discovery or to obey an order of court respecting discovery.
>
> (c) The court, when acting under subdivision (a) of this rule, may make
>
> (4) an order imposing punishment for contempt, except that a party may not be punished for contempt for a refusal to submit to a physical or mental examination under Rule 4010;
>
> (5) such order with regard to the failure to make discovery as is just.

Pa. R.C.P. No. 4019.

The decision whether to sanction a party for a discovery violation and the severity of the sanction are vested in the sound discretion of the trial court. *Judge Technical Services, Inc. v. Clancy*, 813 A.2d 879 (Pa. Super. 2002). A trial court should not impose sanctions for failure to allow discovery unless a party has disregarded a court order. *Stern v. Vic Snyder, Inc.*, 473 A.2d 139 (Pa. Super. 1984).

The following factors are considered in determining appropriate sanctions for failure to comply with discovery orders: (1) the nature and severity of the discovery violation; (2) the defaulting party's willfulness or bad faith; (3) prejudice to the opposing party; (4) the ability to cure the prejudice; (5) the importance of the precluded evidence in light of the failure to comply. *Judge Technical Services, Inc.*, 813 A.2d at 879. Only counsel fees incurred as a direct result of

a discovery violation should be imposed as discovery sanctions except in the most egregious cases. *Sun Pipe Line Co v. Tri-State Telecomm., Inc.*, 655 A.2d 112 (Pa. Super. 1994).

The Gold Defendants did not comply with the December 27, 2007 Order, the December 31, 2008 Order, the August 3, 2010 Order and finally the March 29, 2011 Order. The Gold Defendants produced to the Plaintiffs a check for $1,000.00 however, they have continued to fail to produce the documents requested by Plaintiffs and ordered by the Court. The Court notes that the Gold Defendant's now claim that they do not and never had the documents sought by the Plaintiffs. However, the Court also notes that the last three Court Orders that sanctioned the Gold Defendants were for not producing such documents and if the documents were not in the Gold Defendants' possession then they should so pled. Furthermore, the Gold Defendnats at no time, despite being directly asked by Plaintiffs, informed the Plaintiffs either that they were not in possession of the Hanson invoices. Therefore, the Gold Defendants have violated not only one, but four Court Orders, making sanctions appropriate in this case. *Stern*, 473 A.2d at 139.

In determining the appropriate sanctions for the Gold Defendants, the five factor test should be used as set forth in *Judge Technical Services, Inc.*, 813 A.2d at 879. The nature and severity of the discovery violation is such that Gold Defendants have not only violated four Court Orders, resulting in almost a five year delay in getting the requested documents to the Plaintiffs that they apparently now state they never had, but they have also misled the Plaintiffs through five years of discovery motions costing them a substantial amount of money in the pursuit of documents and have wasted the Court's time for the past five years by conducting argument on discovery motions related to these documents.

The defaulting party's willfulness or bad faith can be viewed to be notably egregious in this case. As stated hereinbefore, the Gold Defendants have led the Plaintiffs through five years

of discovery motions costing them significant and repeated expense in search of documents that they now assert they never had, they submitted false verifications and testimony at the hearings, they have failed to produce computations that Mr. Gold himself testified at deposition that he prepared for the $7.64 share value and they misled the Court by attempting to pass off interrogatory answers filed in 2009, and modified in 2010, which themselves were found inadequate even then, as a current attempt to comply with the previous Order. For an unknown reason and despite request from the Plaintiffs, the Gold Defendants apparently felt it unnecessary to inform either the Plaintiffs or the Court of the fact that they did not have the documents being sought.

The prejudice to the opposing party is significant. The Plaintiffs assert that the documents which they have not been permitted to access included information related to specific multi-million dollar contracts. These contracts are the basis for this action, and it was the securing of the contracts that the Plaintiffs allege spurred the majority shareholder Defendants to conspire to freeze the minority shareholder Plaintiffs out of the corporation. The documents at issue include valuable information which would assist the Plaintiffs in establishing the value of the business from which Plaintiffs assert that they were improperly excluded. Without the proper documentation on how the price per share for the corporation was calculated, the Plaintiffs do not have the means necessary to calculate a figure for damages.

The Gold Defendants do not possess the ability to cure the prejudice as they now assert that they do not have the documents to produce. Therefore, they would not be able to provide to the Plaintiffs the documents they have been requesting for the past five years that would provide the basis for the damages in their action. The Court notes that it was determined during the evidentiary hearing that the necessary discovery could be collected by conducting a deposition of

Hanson Aggregates West, Inc., in Texas, which was previously requested by Plaintiffs and granted by the Court. However, the Court finds that the Plaintiff's decision not to subpoena the Hanson corporation does not in any way purge the Gold Defendants of contempt as it would have cost the Plaintiffs an upwards of $10,000 for documents that they were being led to believe existed in either Pittsburgh, Pennsylvania or Franklin, Pennsylvania.

The importance of the precluded evidence is significant. The STO's billings and receivables, STO's receipts and payments would be offered by the Plaintiffs to establish that STO had sufficient billings and receivables to satisfy the indebtedness to the Muse Defendants, proving further that the Sheriff's sale was not a legitimate judgment execution. The general ledgers and bank statements would be offered to establish that the Muse Defendants returned assets of STO to the Gold Defendants from which they received money after the Sheriff's sale as further payment for the Golds' cooperation in the conveyance of the Hanson contract and STO business at the execution sale. The Court finds that the Gold Defendants have been granted multiple opportunities to comply with its orders an despite being repeatedly warned by this Court of the consequences of their misconduct, have instead chose to misrepresent and verify untrue statements. Therefore, Plaintiff's Motion to Enforce Contempt, for Additional Sanctions and for Attorney Fees is hereby GRANTED. An appropriate Order will follow.

BY THE COURT,

OLIVER J. LOBAUGH, President Judge

CC: S. Petrikis, Esquire 412-918-1199
    J. Babyak, Esquire, 412-261-5066
    Dennis Gold, 215 Big Oak Drive, Franklin PA 16323
    Bonnie Gold, 215 Big Oak Drive. Franklin, PA 16323

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA
CIVIL DIVISION – LAW AND EQUITY

JOHN R. FREY and H. ELAINE FREY,
husband and wife; and G. ROBERT and SUE
FREY, husband and wife,
      Plaintiff/Counterclaim
      Defendants,

      v.

BONNY GOLD and DENNIS GOLD, husband
and wife; SLURRY TECHNOLOGIES
OPERATING, LLC; SLURRY
TECHNOLOGIES OPERATING, INC. now
known as AGGREGATE SOLUTIONS, INC.;
PILGRIM ENERGY COMPANY f/k/a
PILGRIM COAL COMPANY; CHARLES A.
MUSE, JR. individually; ALBERT C. MUSE,
individually; CHARLES A. MUSE, JR. and
ALBERT C. MUSE trading as ESUM
PARTNERSHIP NO. 2; and SLURRY
TECHNOLOGIES, INC.,
      Defendants,

      v.

JAMES and ROBIN FREY MILLER,
      Additional Counterclaim
      Defendants.

CIV. NO. 232-2002

## ORDER OF COURT

AND NOW, this 26 day of November, 2012, in accordance with the Opinion of Court filed this same date, it is hereby ORDERED and DECREED as follows:

1. Judgment is entered in favor of Plaintiffs and against Dennis Gold, Bonny Gold, Slurry Technologies Operating, LLC ("STO") and Slurry Technologies, Inc. ("STI") on all claims included in this consolidated proceeding;

2. Evidence of expenses incurred in performance of the Hanson contract is hereby excluded at trial;



IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA
CIVIL DIVISION – LAW AND EQUITY

JOHN R. FREY and ELAINE FREY, husband
and wife, and G. ROBERT and SUE FREY,
husband and wife,

    Plaintiffs/Counterclaim-Defendants,

  v,

BONNY GOLD and DENNIS GOLD, husband
and wife; SLURRY TECHNOLIGIES, LLC;
SLURRY TECHNOLOGIES OPERATING, INC.,
n/k/a AGGREGATE SOLUTIONS, INC.,
PILGRIM ENERGY COMPANY, f/k/a
PILGRIM COAL COMPANY; CHARLES A.
MUSE, JR., individually; ALBERT C. MUSE,
individually, CHARLES A. MUSE JR., and
ALBERT C. MUSE, trading as ESUM
PARTNERSHIP NO. 2, and SLURRY
TECHNOLOGIES, INC.,

    Defendants,

  v.

JAMES and ROBIN FREY MILLER,

    Additional Counterclaim Defendants.

CIV No. 232-2003

1120 WDA 2016
1158 WDA 2016

2016 OCT -7 AM 9: 59

FILED COMMON PLEAS COURT VENANGO COUNTY

## OPINION OF COURT PURSUANT TO 1925(a)

AND NOW, ___October 7___, 2016, the Court has for consideration two Statements of Errors filed pursuant to Pa. R.A.P. 1925(b). The first is filed on behalf of the Defendants Pilgrim Energy Company, Pilgrim Coal Company, Charles Muse and Albert C. Muse individually, Charles Muse and Albert C. Muse trading as ESUM Partnership No. 2, Aggregate Solutions, and Albert C. Muse in his capacity as the Personal Representative of Charles H. Muse, Jr. ("the Muse Defendants"). The second is filed on behalf of the Defendants Dennis Gold, Bonny Gold, and Slurry Technologies Operating, LLC ("the Gold Defendants"). Both sets of defendants appeal from the judgment entered pursuant to the jury's verdict and this

1

F

Court's Order of June 13, 2016, which disposed of the parties' post-trial motions. Pennsylvania Rule of Appellate Procedure requires that "the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found." Accordingly, we render the following Opinion.

I

A brief summation of the facts and procedural history of this case is as follows. Plaintiff H. Elaine Frey ("Elaine" or "Elaine Frey") invested in an entity known as Slurry Technologies Operating, LLC in 1997, hereinafter referred to as "STO." Defendant Bonny Gold was the 60% capital stock holder or majority owner of STO and Elaine Frey was the 40% owner and minority stock holder. Bonny Gold's husband and co-Defendant, Dennis Gold, was the president of STO. Plaintiff John Frey, the husband of Elaine, was employed at STO as an engineer.

STO provided water purification technology in the coal mining industry. More specifically, the company was involved in the sale, design, construction and operation of equipment for the processing of industrial slurries. Dennis Gold contributed his patents for purification and Elaine Frey agreed to pay $150,000 to help capitalize the company. Bonny Gold and Elaine Frey entered into a Pre-Incorporation Agreement dated November 15, 1996. The two entered into an Operating Agreement a short time thereafter.

On February 16, 1999, Pilgrim Coal Company made a loan to both STO and a separate company named Slurry Technologies Operating Inc., hereinafter "STI", in the amount of $250,000.00.[1] Charles H. Muse, Jr. was the president and director of Pilgrim Coal Company at

---

[1] Pilgrim Coal company later rebranded as "Pilgrim Energy Company." Together, they are hereinafter referred to simply as "Pilgrim."

the relevant time for this proceeding. Albert C. Muse was Vice-President of Pilgrim Coal Company at the relevant time for this proceeding and was Charles H. Muse Jr.'s first cousin. Collectively, Albert C. Muse and Charles H. Muse Jr. would from time to time capitalize businesses under the trade name of "ESUM Partnership No. 2." The Loan Agreement in question (the "Pilgrim Loan Note") was signed by Dennis D. Gold, as Vice Chairman of STO, Dennis D. Gold, as President of STI, and Charles H. Muse, Jr., President of Pilgrim Coal Company. Elaine Frey and Bonny Gold signed a Certificate and Authorization by the Members of STO to the Loan Agreement. The Pilgrim loan would eventually be defaulted on in 2001.

Plaintiffs G. Robert Frey and Sue Frey, the parents of John Frey, agreed to offer a $50,000.00 Certificate of Deposit ("CD") account as collateral for a loan for STO. The Note therefor was signed on behalf of STO by Dennis Gold on November 6, 2000.

On October 3, 2001, John and Elaine Frey instituted an action against Dennis Gold, Bonny Gold, and STO asserting causes of action for violations of the Pennsylvania Wage Payment and Collection Law (hereinafter "WPCL" see 43 P.S. §§ 260.1 – 260.12), for breach of contract, for wrongful termination, for unjust enrichment, for breach of duty of good faith and fair dealing, for breach of fiduciary duty, for an accounting, for freeze out, for fraudulent misrepresentation, for repayment of loans, for civil conspiracy and for a declaratory judgment. Around the same time, Robert and Sue Frey also instituted an action against STO and Dennis Gold alleging breach of contract, breach of security agreement, fraudulent misrepresentation and requesting the imposition of a constructive trust. Both of these suits were eventually consolidated with the instant action.

On November 30, 2001, a meeting occurred between Albert and Charles Muse with John and Elaine Frey in Pittsburgh. The content of the discussion that took place at that meeting is

3

disputed, but essentially the Muse Defendants offered to provide John and Elaine Frey a limited ownership interest in an STO successor company, provided that the Freys would in return cease their litigation against the Defendants. John Frey, believing the settlement offer to be inadequate for various reasons, declined.

As previously mentioned, STO defaulted on the Pilgrim Loan Note in 2001. On November 5, 2001, Pilgrim filed a Confession of Judgment against STO, STI, and Dennis and Bonny Gold in the amount of $365, 627.23 pursuant to the terms of the Pilgrim Loan Note. The Gold Defendants took no steps to defend against this judgment nor did they attempt to delay the execution of the sheriff's sale. Accordingly, a sheriff's sale was held on December 19, 2001. The sale took place at the offices of STO. At that sale, Pilgrim purchased all the physical assets of STO and/or STI. These assets included several service contracts, the most notable of which was the "Hanson contract," an agreement to provide the STO's slurry-processing services to an energy company located in Texas.

The instant action was initiated pursuant to the Writ of Summons of John and Elaine Frey of February 22, 2002. Though this action asserts many different rights of redress under a variety of legal theories, perhaps the core allegation by the Plaintiffs is that the Gold and Muse Defendants acted in concert to deprive John and Elaine Frey of their respective employment and ownership positions at STO such that the Muse and Gold Defendants could enjoy the fruits of the water purification business to the exclusion of John and Elaine Frey. *See* Trial Tr. Day 1, pp. 38-41. In particular, they allege that the Gold Defendants did not contest the acquisition of STO (the primary asset of which was the Hanson contract) at the time of the sheriff's sale. *Id.* In exchange for that cooperation, the Muse Defendants agreed to reward the Gold Defendants both with employment and an ownership stake in STO's successor company. *Id.* Indeed, it is uncontested

4

that the Muse Defendants did employ Dennis Gold at STI following their acquisition of the company, that this employment occurred in the exact office space utilized by STO prior to the sheriff's sale, and that STO and STI share remarkably similar monikers, STI would eventually rebrand as "Aggregate Solutions, Inc."

This litigation has been the subject of numerous and protracted discovery disputes. On September 2, 2008, the Plaintiffs filed the first of several motions requesting sanctions for discovery violations. The Court first held the Gold Defendants in contempt on March 29, 2011, and again on November 26, 2012. In the November 26, 2012 Order, the Court held the Gold Defendants in contempt and granted the Plaintiffs' Motion for Additional Sanctions, thereby entering "judgment in favor of Plaintiffs and against Dennis Gold, Bonny Gold, Slurry Technologies Operating, LLC ("STO") and Slurry Technologies, Inc. ("STI") on all claims included in this consolidated proceeding." Order of Court Dated November 26, 2012 at ¶1. In essence, the sanctions precluded the Gold Defendants from litigating at trial any issues relating to their liability, and limited any defense they might tender solely to the issue of damages.[2]

Dennis Gold appealed this Courts' imposition of sanctions to the Superior Court on December 26, 2012. The Plaintiffs opposed the appeal on procedural grounds, arguing that the Gold Defendants failed to adhere to the Pennsylvania Rules of Appellate Procedure governing the taking of permissive appeals. The Superior Court quashed the appeal as improvidently taken and remanded the matter to this Court for further proceedings on March 6, 2013. *See* Superior Court Docket No. 13 WDA 2013.

---

[2] A fuller discussion of the sanctions imposed upon the Gold Defendants appears *infra* in Section III.

5

The matter eventually proceeded to trial, which began on November 14, 2014, and ended on November 24, 2014. The jury returned a verdict finding the various Defendants liable on certain claims and not liable on others. With respect to the Gold Defendants:

- The jury awarded the Plaintiff John Frey $77,114.00 for unpaid wages, fringe benefits and severance pursuant to the Pennsylvania Wage Payment and Collection Law ("WPCL"). The jury also indicated that an additional 25% should be awarded to John Frey pursuant to the WPCL's provisions on due wages not paid and not the subject of a good-faith dispute.

- The jury awarded Plaintiff John Frey $70,833.00 for wrongful discharge.

- The jury awarded John and Elaine Frey $32,423.00 for loans not repaid, and $40,147.00 for MNBA statements not reimbursed.[3]

- The jury awarded Elaine Frey $150,000.00 for breach of fiduciary duty; breach of the duty of loyalty, and freeze out.

- The jury awarded John and Elaine Frey $400,000.00 for intentional interference with contractual relations.

- The jury awarded John and Elaine Frey $500,000.00 for fraudulent misrepresentation.

- The jury awarded John and Elaine Frey $449,232.00 for civil conspiracy.

- The jury awarded G. Robert Frey and Sue Frey $300,000.00 for civil conspiracy.

With respect to the Muse Defendants:

- The jury determined the value of STO at the time of the sheriff's sale to be $1,000,000.00. Accordingly, subtracting $365,000.00 per the Court's

---

[3] Those specific claims are occasionally referred to as "the breach of contract claims" both *supra* and *infra*.

6

instructions, the jury awarded Elaine Frey $635,000.00 for violation of the Uniform Fraudulent Transfer Act ("UFTA"); 12 Pa. C.S.A. §§ 5101 – 5110.

- The jury awarded John and Elaine Frey $100,000.00 against Pilgrim Energy Company for intentional interference with contractual relations.

- The jury awarded John and Elaine Frey $65,000.00 against ESUM Partnership No. 2 for interference with contractual relations.

- The jury awarded John and Elaine Frey $100,000.00 against ESUM Partnership No. 2 for fraud and/or fraudulent misrepresentation.

- The jury awarded John and Elaine Frey $100,000.00 against Pilgrim Energy Company for civil conspiracy.

- The jury awarded John and Elaine Frey $100,000.00 against ESUM Partnership No. 2 for civil conspiracy

Motions for Post trial relief came from all parties on December 4, 2014. Argument thereon was held May 22, 2015. On June 13, 2016, the Court denied the post-trial motions of the Gold and Muse Defendants in their entirety. With respect to the Plaintiffs' requests for post-trial relief, we granted their motion in part and denied their motion in part. Specifically, we ordered that (1) the verdict be molded to reflect the Gold Defendants' liability for statutory liquidated damages pursuant to the Pennsylvania Wage Payment and Collection Law, (2) the verdict be molded to reflect the Gold Defendant's responsibility for attorneys' fees for the Plaintiffs' WPCL claims, (3) the verdict be molded to reflect the Gold Defendants' responsibility to pay prejudgment interest on the Plaintiffs' claim for breach of contract, (4) the verdict be molded to reflect the Muse Defendants' responsibility to pay prejudgment interest on the Plaintiffs' claims under the Uniform Fraudulent Transfer Act ("UFTA," *see* 12 Pa. C.S.A. §§ 5101 – 5110).

7

The Plaintiffs praeciped for the entry of judgment on July 6, 2016, whereupon judgment was entered in a manner reflective of the verdict and this Court's Order of June 13, 2016. These timely appeals followed.[4] We now turn to the specific assignments of error raised by either set of Defendants.

## II

The Muse Defendants raise fourteen issues on appeal. We address each issue *seriatim*, grouping the issues together where it is sensible to do so.

The first issue raised by the Muse Defendants is whether "there was sufficient evidence provided at trial to support the valuation of Slurry Technologies, LLC at $1,000,000.00?" Muse Defs. Concise Stat. ¶ 1. We understand the issue as taking exception to this Court's denial of the Muse Defendants' post-verdict request for judgment notwithstanding the verdict ("JNOV"). A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. *Hann v. Wells*, 103 A.3d 60, 69-70 (Pa. Super. 2014). In reviewing a trial court's denial of a motion for JNOV, an appellate court should consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the factfinder's verdict. *Id.* Review of legal determinations is plenary. *Id.* However, concerning any question of credibility and the weight to be afforded to the evidence presented at trial, the appellate court should not substitute its own judgment for that of the factfinder. *Id.* "In so doing, we must also view this evidence in the light most favorable to the verdict winner,

---

[4] Though the Order from which the Defendants appeal was entered on June 13, 2016, judgment was not entered until July 6, 2016. A corrected version of the judgment was entered on July 12, 2016, and the docket reflects that notice of this corrected entry of judgment was not actually sent to the Defendants' correct mailing addresses until July 21, 2016. Accordingly, the appeals of both the Muse and Gold Defendants (respectively filed on August 2, 2016 and August 4, 2016) are timely. *See* Pa. R.A.P. 903 (30 days to file appeal); *Lynch v. Metropolitan Life Ins. Co.*, 222 A.2d 925, 926 (Pa. 1966); *Hart v. Arnold*, 884 A.2d 316, 325 n.2 (Pa. Super 2005) (appeal is taken from judgment rather than verdict or order resolving post-trial motions).

giving the victorious party the benefit of every reasonable inference arising from the evidence

and rejecting all unfavorable testimony and inference... If any basis exists upon which the [jury]

could have properly made its award, then we must affirm the trial court's denial of the motion for

JNOV. A JNOV should be entered only in a clear case." *Id.* (citing *Joseph v. Scranton Times,*

*L.P.,* 89 A.3d 251, 260 (Pa. Super. 2014)).

We addressed the Muse Defendants' specific contention that the jury could not have

arrived at their $1,000,000.00 valuation of STO in our Opinion of June 16, 2016 as follows:

> Ordinarily, "the duty of assessing damages is within the province of the
> jury and should not be interfered with by the court, unless it clearly appears that
> the amount awarded resulted from caprice, prejudice, partiality, corruption or
> some other improper influence." *Betz v. Erie Ins. Exchange,* 957 A.2d 1244, 1264
> (Pa. Super. 2008). So long as "the verdict bears a reasonable resemblance to the
> damages proven, we will not upset it merely because we might have awarded
> different damages." *Id.* (citations and quotations omitted). In the case at bar, the
> Court charged the jury that the value of the Hanson contract is to be determined at
> the time the transfer of that contract was effectuated (*i.e.*, the day of the sheriff's
> sale). Trial Tr. Day 7, 191. The Muse Defendants did not object to the charge in
> this respect, and in any event the charge is clearly supported by the relevant
> statutory language contained in the UFTA. See 12 Pa. C.S.A. §5108(c) ("the
> judgment must be for an amount equal to the value of the asset at the time of the
> transfer"). As such, that the contract was ultimately unprofitable may constitute
> some evidence of the contract's value at the time of transfer, but it is by no means
> dispositive. The jury was free, on the other hand, to credit the wealth of testimony
> taken from John Frey that the Hanson contract was worth, at the time of transfer,
> some $4,229,000. Trial Tr. Day 1, 152-157, 159-160. The jury, apparently
> crediting in part Mr. Frey's valuation, awarded a verdict finding that STO was
> worth $1,000,000. See Post-Sentence Motions Tr., 34.

The Muse Defendants attack this valuation by asserting that Slurry's

business was "new and untried, and in its brief history resulted in nothing but

9

Defendants cite is *Pollock v. Morelli*, 369 A.2d 458, 463 (Pa. Super. 1976).
Specifically, they point to the *Pollock* Court's holding that "Damages for lost
profits...cannot be awarded where they are merely speculative." *Id.* In *Pollock*, a
tenant utilizing a commercial rental space for his dry-cleaning business sued his
landlord for breach of the covenant of quiet enjoyment after the landlord's
renovation of the surrounding area restricted parking access to the facility. *Id.* at
459-461. In holding that the tenant could not recover for allegedly lost profits, the
Superior Court explained that

> Appellant sought to show a reduction of profits by introducing an
> accountant who testified that the store's profits did not increase
> according to his projections. The estimation of the anticipated
> increase was of necessity based only on the nine months of operation
> preceding the construction which allegedly marked the beginning of
> the decline of the business. The lower court found, and we agree, that
> the basis for the accountant's projections and estimation of increasing
> profits is not established in the record. No foundation is laid for the
> assumption that the business would increase annually or that it would
> increase at the percentage the accountant estimated from the first few
> months of operation. Consequently we cannot permit a recovery for
> lost profits.

*Id.* at 463 (emphasis added). As such, the present case is clearly distinguishable.
First, as previously noted the Plaintiffs' award was for the value of the Hanson
contract *at the time of transfer*, and as such the Muse Defendants' cited authorities
– all of which deal with *future* earnings – are not entirely apposite. In any event,
John Frey's estimations of the value of the Hanson contract were not a
foundationless "assumption," but were instead derived from the invoices supplied
to STO by Hanson, by Dennis Gold's estimated profit margins, and by the
calculations made therefrom by John Frey. Trial Tr. Day 1, 152-160; *See also*
Pls.' Ex. 32, 61, 70. Moreover, a review of the Hanson contract itself indicates
that it was structured such that STO would be safeguarded against assuming
losses. Trial Tr. Day 1, 161-162. John Frey's testimony regarding the valuation of
the Hanson contract was undoubtedly based to a certain extent upon his educated
projections, and as such his estimation of four-million odd dollars was by no

10

means entirely certain. However, the facts in evidence were such that the jury was free to reject the Muse Defendants' assertion that the Hanson contract was totally worthless at the time it was transferred. See *General Dynafab, Inc. v. Chelsea Industries*, 447 A.2d 958, 960 (Pa. Super. 1982) (holding that, even where evidence submitted to a jury is not "entirely of an unspeculative nature...if the jury believed it, it could have come to a reasonable determination as to damages resulting from loss of future profits," and as such "the evidence should be submitted to the jury to decide its weight[,]"); *See also Delahanty v. First National Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. 1983) (while "the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages," and that accordingly "mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the result of the defendant's conduct.")

In sum, viewing the Muse Defendants' claims through the stringent lens of analysis attendant to a request for judgment n.o.v., we are constrained to reject the proposition that the jury's valuation of STO is shockingly insufficient or speculative. We will decline to vacate the jury's damage determinations on this basis.

Opinion of Court dated June 13, 2016, 14-15. For the foregoing reasons, the Muse Defendants' first issue is without merit and our Order of June 13, 2016 should be affirmed in this respect.

The Muse Defendants' second issue is whether "there was any evidence to support the jury's verdict that Pilgrim Energy Company and Essum[sic] Partnership intentionally interfered with any contractual relations of the Plaintiffs?" Muse Defs.' Concise Stat. ¶ 2. We again understand this issue as alleging that this Court erred in denying JNOV. In our Opinion of June 13, 2016, we disposed of this issue in the following fashion:

A cause of action for tortious interference of contract will lie if the following four elements are established: (1) a contractual relationship exists; (2) the defendant intends to harm the plaintiff by interfering with that contractual relationship; (3) there exists no privilege or justification for such interference; and

11

(4) damages result from the defendant's conduct. *Hennesy v. Santiago*, 708 A.2d 1269, 1278 (Pa. Super. 1998) (citing *Triffin v. Jannssen*, 626 A.2d 571, 574 (Pa. Super. 1993). Contrary to the Muse Defendants' assertions, there was a substantial amount of testimony and documentary evidence tendered by the Plaintiffs that advanced the existence of contracts between the Freys and Golds, the Muse Defendants' intent to interfere with those contracts, and resultant harm therefrom. *See, e.g.*, Ex. 1 (STO's pre-incorporation agreement, including an employment agreement vis-à-vis John Frey); Ex. 2 (Operating agreement); Ex. 4 (Demand Note); Ex. 35 (Draft merger proposal which included a provision that ESUM would have to approve any payment made to the Freys); Trial Tr. Day 1 108-111 (testimony of John Frey regarding Charles Muse's involvement in his termination); Trial Tr. Day 4, 101-102 (testimony of Robert Frey regarding Charles Muse's involvement in John Frey's termination). Thus, the Muse Defendants' Motion essentially asks the Court to variously discount, reject or ignore the Plaintiffs' evidence. Given the exacting standard by which we must evaluate a request for judgment notwithstanding the verdict, we will decline to do so.

Opinion of June 16, 2016, at 17-18. A review of the record has not revealed any reason to disturb this determination. Accordingly, the Muse Defendants' second issue is without merit and judgment in this respect should be affirmed.

The Muse Defendants' third through sixth issues assign error to this Court's upholding the jury verdict entered against Pilgrim Energy Company with respect to the Plaintiffs' UFTA claims. Specifically, issue three (3) asks whether there was "any evidence to support the jury's verdict," issue four (4) asks whether the jury's verdict may stand in light of Pilgrim Energy's being "the transferee of the property alleged to have been transferred," issue five (5) asks whether the verdict may stand "when the evidence regarding damages was speculative at best," and issue six (6) asks whether the verdict may stand "given the speculative nature of the assets[.]" Muse Defs. Concise Stat. ¶¶ 3-6. Additionally, the Muse Defendants' tenth (10) issue

12

asks whether there was "sufficient evidence to support the jury's verdict that Pilgrim Energy was liable for violations of the Uniform Fraudulent Transfer Act?"[5]

In resolving the Muse Defendants requests for post-verdict relief, this Court has previously found that the Muse Defendants' arguments regarding the sufficiency of evidence surrounding the UFTA claims were waived for the reason that they failed to develop the arguments with sufficient particularity. See Opinion of June 16, 2016, p.18 ("Absent any citation whatsoever by the Muse Defendants to the record, and absent any citation to any legal authority other than a passing reference to one particular provision of the UFTA, it is difficult to imagine how the Court might go about responding to the Muse Defendants' arguments on their merits"). In their post-verdict filings, the Muse Defendants appeared to argue that the evidence surrounding the Plaintiffs' UFTA claims was insufficient for the sole reason that the assets transferred to Pilgrim were indisputably worthless, and accordingly damages were not sufficiently proven. As such, by asserting there was insufficient evidence to uphold the verdict with respect to the UFTA claim, the Muse Defendants do little more than reassert their first issue that the assets transferred to them at the time of the sheriff's sale (i.e., STO, the most notable asset of which was the Hanson contract) were worth nothing. See Opinion of June 16, 2016, p.19 ("As best as the Court can guess, the Muse Defendants attempt to bootstrap their assertion that the Hanson contract was indisputably worthless onto a sufficiency of the evidence argument vis-à-vis the Plaintiffs' UFTA claim"). To the extent Muse Defendants' instantly-asserted third issue questions the sufficiency of the evidence surrounding the UFTA claim in some other respect, we

---

[5] To the extent that the Muse Defendants' third and tenth issues present distinct assertions of error, we understand the former as taking issue with this Court's denial of JNOV and the latter as taking issue with this Court's denial of summary judgment. While the following analysis focuses on this Court's resolution of post-trial motions rather than pre-trial proceedings, we found the merits of the Muse Defendants' summary judgment request unavailing for somewhat more substantive legal reasons. See Opinion of Court dated December 31, 2013, pp. 27-28.

13

are wholly in the dark as to which precise elements the Muse Defendants believe the claim to be lacking, and in any event any alternative basis for an insufficiency argument has surely been waived. *See* Pa. R.C.P. 227.1(b)(2). Indeed, the Muse Defendants' fifth and sixth issues (which are themselves roughly indistinguishable from each other) essentially restate the third issue (as this Court understands it) insofar as they explicitly state that damages were insufficiently proven.[6]

The fourth issue, by contrast, calls into question whether a "transferee" of assets "alleged to have been transferred" can be liable under the UFTA. Muse Defs. Concise Stat. ¶ 4. A review of the record does not make clear at which stage in the litigation of this case, if ever, the Muse Defendants have levied this precise argument before, and as such we preliminarily believe the issue to be waived. Pa. R.C.P. 227.1(b). In any event, though certainly a novel argument, the Muse Defendants' apparent position that a claim does not lie against the transferee of a voidable transfer is explicitly contrary to the provisions of the UFTA's text:

> § 5108. Defenses, liability and protection of transferee
> \*\*\*
> (b) Judgment for certain voidable transfers.--Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) (relating to remedies of creditors), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. **The judgment may be entered against...the first transferee of the asset or the person for whose benefit the transfer was made[.]**

12 Pa. C.S.A. § 5108(b) (emphasis added). The mere fact that Pilgrim was a "transferee" rather than a "debtor" within the meaning of the UFTA does not bear on Pilgrim's liability for having been transferred the Hanson contract or any other STO asset. *See* 12 Pa. C.S.A. §§ 5104, 5107,

---

[6] A brief summation of the averments and discovery evidence relied upon in our denial of the Muse Defendants' request for summary judgment can be found in our Opinion of Court dated December 31, 2013, pp. 27-28.

14

5108. Accordingly, the Muse Defendants' fourth issue is likewise without merit, and judgment in this respect should be affirmed.

The Muse Defendants seventh issue is whether it was "an error of law to permit entry of a judgment against the Defendants arising out of a purported transfer when the transfer at issue occurred at a sheriff's sale of the property at issue?" Muse Def. Concise Stat. ¶ 7. In our Opinion of December 31, 2013, disposing of the Muse Defendant's Motion for Summary Judgment, we rejected the contention that effectuating a transfer of assets via a sheriff's sale immunizes the transferee from civil conspiracy claims as follows:

> A civil conspiracy can be shown by a combination of two or more persons acting with a common purpose to do a lawful act by unlawful means or for an unlawful purpose...The fact that the Muse Defendants were acting as a judgment creditor does not immunize them from being sued for a civil conspiracy. The execution Sheriff's Sale may have been a lawful act, but the Plaintiffs allege that it was done by unlawful means or for an unlawful purpose... [Additionally,] Plaintiffs claim that the sale occurred without proper notice to Elaine Frey, so it could also have been an unlawful act.

Opinion of December 31, 2013 (citing *Phillips v. Selig*, 959 A.2d 420, 437 (Pa Super. 2008); *Landau v. Western Pennsylvania Nat. Bank*, 282 A.2d. 335, 224 (Pa. 1971)). While the instant assertion that some intrinsic property of sheriff's sales should absolve the Muse Defendants of liability is not specifically couched in terms of the Plaintiffs' civil conspiracy claims (indeed, the complained-of "judgment...arising out of a purported transfer" would seem to include the jury's award for civil conspiracy as well as those for fraudulent misrepresentation, interference with contractual relations, and violation of the UFTA), we believe the above-quoted logic applies with equal force to all damages the jury determined the Plaintiffs to have endured by way of the Muse Defendants' pursuit of the sheriff's sale. In any event, a review of the record does not indicate that the Muse Defendants have raised the inherent legitimacy of the sheriff's sale as a defense at any previous point in this litigation, and accordingly we believe the issue to be waived. *See*

15

*Berman v. Radnor Rolls, Inc.*, 542 A.2d 525, 529-530 (Pa. Super. 1988) (failure to develop arguments via argument and briefs before the trial court following an adverse verdict results in waiver of the issue during appellate proceedings); *See also* Pa. R.C.P. 227.1(b)(2) (failure to raise issue is post-trial motion results in waiver). For the foregoing reasons, we find the Muse Defendants' seventh issue is without merit and judgment in this respect should be affirmed.

The Muse Defendants' eighth issue asks whether the Plaintiffs were "estopped or did they otherwise waive the ability to claim that the sheriff's sale was improper when they failed to participate in that sale?" Muse Def. Concise Stat. ¶ 8. The Muse Defendants' eighth issue essentially ignores the nature of the Plaintiffs' allegations surrounding the Defendants' pursuit of the sheriff's sale; *i.e.*, the Plaintiffs alleged that they did not "fail to participate" in the sheriff's sale, but rather that they were precluded from participation in the sale as a result of the joint machinations of the Gold and Muse Defendants. Trial Tr. Day 1, p. 41. In light of the verdict, it would seem that the jury accepted the Plaintiffs' version of facts, and given the exacting standards by which a request to disturb the jury's findings must be adjudged, we see no grounds which would necessitate disturbing the jury's findings. *Hann*, 103 A.3d at 69-70. Moreover, the Muse Defendants did not raise the issue of the Plaintiffs' purported lack of diligence in contesting the sheriff's sale during post-trial proceedings, and we therefore construe the issue as having been waived. *See Berman* 542 A.2d at 529-530 (failure to develop arguments via argument and briefs before the trial court following an adverse verdict results in waiver of the issue during appellate proceedings) *See also* Pa. R.C.P. 227.1(b)(2) (failure to raise issue is post-trial motion results in waiver). Accordingly, the Muse Defendants' eighth issue is without merit.

The Muse Defendants' ninth issue questions the sufficiency of the evidence "to support the jury's finding that Pilgrim Energy Company and Esum Partnership No. 2 were liable for civil

16

conspiracy[.]" A question as to the sufficiency of the evidence in a claim for conspiracy is one for the trial judge, who must preliminarily determine whether there is sufficient evidence of an unlawful agreement such that the case should be submitted to a jury. *Rosenblum v. Rosenblum,* 181 A. 583, 584-585 (Pa. 1935). In this Court's Opinion of December 31, 2013, we denied the Muse Defendant's request for summary judgment on this issue as follows:

> After reviewing the numerous depositions and documents attached as exhibits to the Plaintiffs' Brief in Opposition to Motion for Summary Judgment of the Muse Defendants as well as the record, it is clear that there remain issues of genuine material fact for the Trier of Fact to resolve as to whether or not a civil conspiracy existed.
>
> A civil conspiracy can be shown by a combination of two or more persons acting with a common purpose to do a lawful act by unlawful means or for an unlawful purpose. *Phillips v. Selig,* 959 A.2d at 437. The fact that the Muse Defendants were acting as a judgment creditor does not immunize them from being sued for a civil conspiracy. The execution Sheriff's Sale may have been a lawful act, but the Plaintiffs allege that it was done by unlawful means or for an unlawful purpose. See *Landau v. Western Pennsylvania Nat. Bank,* 282 A.2d. 335, 224 (Pa. 1971). Plaintiffs claim that the sale occurred without proper notice to Elaine Frey, so it could also have been an unlawful act. .
>
> Additionally, in *Landau,* the Plaintiff made only a "single, vague, and conclusory allegation that the mortgagee and lessee have 'conspired' to the detriment of the mortgagors," the Pennsylvania Supreme Court held that "falls far short of the requisite pleading of the material facts." 282 A.2d at 225(Complaint stated, "Plaintiff has conspired with the Kroger Co. to limit the value of the subject property at foreclosure and by doing so has adversely affected Defendant's rights."). As this Court stated in overruling the Muse Defendants' preliminary objections[,]
>
> > [We] do not believe that the [Muse Defendants' relied-upon authority] *Landau v. Western Pennsylvania National* Bank, 445 Pa. 217, 282 A.2d 335 (1971) applies here. In *Landau,* the Court stated that the underlying

17

act upon which the plaintiff based his conspiracy claim was lawful. *Id.*, 445 Pa. at 224, 282 A.2d at 339. Therefore, a conspiracy could only exist if said lawful act was done by unlawful means or for an unlawful purpose. *Id.* The Court found that the pleadings were insufficient to establish a conspiracy. Here, however, the Complaint is fraught with allegations of fraud. For instance, as the Plaintiffs point out in their brief in opposition to the preliminary objections, the Plaintiffs allege that Dennis Gold and Charles A. Muse, Jr., individually and as President of defendant Pilgrim, conspired and agreed to terminate the employment of John Frey from STO and to freeze out the Freys from further involvement in the business and affairs of STO, all in the hopes of compelling the disgorgement of Elaine Frey's forty percent (40%) interest in STO and precluding the Frey's from participating in anticipated future profits.

Opinion and Order of Court dated January 20, 2004. The Court holds that based on the depositions and exhibits attached to the Plaintiffs' Brief in Opposition to Motion for Summary Judgment, there are issues of credibility and genuine issues of material fact to be determined as to whether or not the [Freys] were informed of the Sheriff's Sale, whether or not the Freys were prevented from viewing critical financial information, whether or not the travel/personal account of Mr. Gold was used to commingle funds from the same company, the purpose for which Mr. Muse created [STI], the purpose of the loans from ESUM to STO, whether the Golds and the Muse Defendants benefited from the venture of [STI], etc. These issues of credibility cannot be resolved through depositions alone.

The Muse Defendants also argue that the Freys have suffered no damages and thus no conspiracy claim exists. The Court holds that the Muse Defendants have not foreclosed the possibility of damages. Plaintiffs argue that at the time of the Sheriff's sale, the Freys had instituted a lawsuit seeking to recover, "Elaine's investment ($150,000.00), the failure to pay John his salary during his time of employment ($85,000), the loans to the company ($15,500), the credit card debt ($44,000)," Pls' Br. in Opp. to Mot. for Sum. J. of the Muse Def.'s, P. 26. It is unclear what profits the Hansen contract made in relation to the companies' expenses as the four year discovery delay ended with Dennis Gold stating that [he did not actually possess the invoices in question, despite his having indicated to

18

the contrary for five years[7]]. [Plaintiff's point] the court to *Merriweather v. Philadelphia Newspapers,* where the Pennsylvania Superior Court reversed a Trial Court's grant of Summary Judgment when the non-moving party should have been entitled to the benefit of the adverse inference that the headline writer and reviewer were not identified, but were witnesses within the exclusive control of Appellees. The Court stated, "[a]ccordingly, for summary judgment purposes, this allegation must be afforded the inference that these persons are missing witnesses and that their testimony would be adverse to Appellees." 684 A.2d 137, 142 (Pa. Super. 1996). Here, the Plaintiffs are entitled to the inference that the invoices/documents regarding the [Hanson] contract would have been adverse to the moving party since the moving party has refused to produce them in direct contempt of a Court Order. Thus, Summary Judgment is not appropriate as there remain genuine issues of material fact to be determined as to any damages flowing from the civil conspiracy claim.

Opinion of Court dated December 31, 2013, pp. 23-26. *See also* Opinion of Court dated June 13, 2016, pp. 20-22 (denying request for JNOV on civil conspiracy claims). A review of the record does not endow upon this Court a reason to disturb our previous determinations, and accordingly, we find that the Muse Defendants' ninth issue is without merit.

The Muse Defendants' eleventh issue asserts that the Court should "have molded the verdict entered against the Defendants on the Plaintiffs' claim for violation of the [Uniform] Fraudulent Transfer Act[.]" During post-trial proceedings, the Muse Defendants asserted a right to a molded verdict under two different theories. *See* Muse Defs.' Br. in Support of Post-Trial Mot. 9-12. First, they asserted that because the assets of STO (most notably the Hanson contract) were indisputably worthless, the verdict should be molded to zero. *Id* at 9-10. We rejected this claim following an identical rationale with which we rejected all of the Muse Defendants' other

---

[7] *See* Section III, *infra.*

19

arguments that hinged upon the supposedly irrefutable impoverishment of STO. *See* Opinion of Court dated June 13, 2016, at p. 22 n.10.

Additionally, the Muse Defendants have previously argued that the verdict should be molded downward because the UFTA's provisions regarding the protection of transferees should operate to limit the Plaintiffs' recovery to an amount commensurate with the Plaintiffs' claims against the debtor (*i.e.*, STO and the other Gold Defendants). Muse Defs.' Br. in Support of Post-Trial Mot. 9-10. The relied-upon statutory provision reads as follows:

> **§ 5108. Defenses, liability and protection of transferee**
> \*\*\*
>> **(b) Judgment for certain voidable transfers.**--Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) (relating to remedies of creditors), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), **or the amount necessary to satisfy the creditor's claim, whichever is less.**
>> \*\*\*
>> **(c) Measure of recovery.**--If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

12 Pa. C.S.A. § 5108 (emphasis added). In essence, the Muse Defendants' request to mold the verdict downward hinges upon the notion that many of the Plaintiffs' claims against the Gold Defendants were meritless. Opinion of Court dated June 13, 2016, at p. 23 (noting that the Muse Defendant's brief in support of post-trial motions argued "that STO was not liable for fraudulent misrepresentation, intentional interference with contractual relations, or civil conspiracy, and accordingly asking the Court to reduce the verdict so that it does not include damages against the Muse Defendants reflective of those claims"). We determined this argument to have been previously waived by way of the Muse Defendants' failure to raise it during preliminary objections, summary judgment, the entrance of sanctions against the Gold Defendants, the submission of proposed points for charge, or at any other stage of proceedings:

20

[The] Muse Defendants' newfound interest in the liability of the Gold Defendants does not previously appear anywhere of record. Indeed, our Order of November 26, 2012 resolved the issue of the Gold [Defendants'] liability, and the Muse Defendants failed to object to that Order both prior to and following its entry. If there ever was a time for the Muse Defendants to raise their concern that precluding evidence relating to STO's liability would impact their own ability to defend against UFTA claims, their window for doing so surely expired long before the post-verdict context in which these concerns are now raised for the first time. Moreover, the Muse Defendants were free to present evidence relating to the amount of damages resulting from STO's conduct, and they do not presently identify anything in the record indicating that they ever did so such that they might be entitled to the relief they now seek.

Opinion of Court dated June 13, 2016, at 23-24; *See also* Pa. R.C.P. 227.1(b)(1) (in order to be eligible for post-trial relief, the movant must have made the request, if available, "in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial"). Accordingly, we find the eleventh issue raised by the Muse Defendants to be without merit, and judgment in this respect should be affirmed.

The Muse Defendants' twelfth issue assigns error to this Court's "awarding the Plaintiffs prejudgment interest on their claims[.]" Muse Defs.' Concise Stat. ¶ 12. In this Court's Opinion of June 13, 2016, we supported our award of prejudgment interest on the UFTA as follows:

The Plaintiffs next request the Court to add prejudgment interest for the jury's award against the Muse Defendants pursuant to the UFTA. Pls. Br. 6-7; Pls. Br. in Opposition 20-22. While there is scant controlling authority directly on the propriety of a post-verdict award of prejudgment interest in context of an action brought under the UFTA, the Plaintiffs have identified two occasions where federal trial courts have found such an award to be appropriate. *In re Blanstein*, 260 B.R. 698 (E.D. Pa. 2001); *Tiab Communications Corp. v. Keymarket of Nepa, Inc.*, 263 F.Supp.2d 925 (M.D. Pa. 2003).

Muse Defendants answer that, because the UFTA claims are not contract claims, prejudgment interest is not available as of right. Muse Defs. Br. in

21

Opposition 14-15. According to the Muse Defendants, "prejudgment interest" in the context of non-liquidated harms and circumstance-dependent cases (*i.e.*, tort claims rather than contract claims) is a concept better characterized as damages for a party's delay. *Id.* The Muse Defendants cite *Robert Wooler Company v. Fiduciary Bank* for the proposition that, "[t]o the extent that prejudgment interest is recoverable in tort cases, it is more accurately identified as compensation for delay." 479 A.2d 1027, 1034 (Pa. Super. 1984) (citing *America Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050, 1056 (3d. Cir. 1982); *Marrazzo v. Scranton Nehi Bottling Co.*, 263 A.2d 336 (Pa 1970)). Relying on *Philadelphia Drying Machinery Company, v. Kummerer*, they moreover contend that requests for delay damages in tort claims are necessarily fact-intensive, and as such questions relating to the propriety of such an award must be submitted to the jury. 56 Pa. Super. 24, 31 (1913).

Indeed, one of the main points of contentions is whether or not a UFTA claim does, in fact, constitute a "tort." Plaintiffs argue that "a UFTA claim is not a tort claim, and the Muse defendants cite to no case that says it is," and that rather than sounding in tort, a UFTA action "is a claim pursuant to a statute." Pls. Br. in Opposition, 20 (emphasis original). The Muse Defendants counter that "Any civil action that's not a contract action is a tort." Post Sentence Tr., 14.

In the Court's estimation, both of these arguments rely upon some measure of overstatement. We cannot agree that the mere codification by the legislature of a particular type of fraud has the effect of completely re-characterizing it as entirely non-tortious; on the other hand, even a cursory review of the Pennsylvania Rules of Civil procedure reveals many types of non-contract claims bearing little similarity to the traditional notion of what constitutes a tort. *Cf., e.g.*, Pa.R.C.P. 1901 – 1959 (governing proceedings held pursuant to the domestic relations code); with Black's Law Dictionary 1626 (9th ed. 2009) (defining, *inter alia*, "tort" as "a breach of duty that the law imposes on persons who stand in particular relation to one another"). In any event, we will not herein engage in the thorny endeavor of defining which actions sound in tort and those which do not. *See id.* (quoting Keeton et al., *The Law of Torts* § 1, at 2-3) ("It

22

might be possible to define a tort by enumerating the things that it is not. It is not a crime. It is not a breach of contract. It is not necessarily concerned with property rights or problems of government...But this again is illusory, and the conception of a sort of legal garbage-can to hold what can be put nowhere else is of no help. In the first place, tort is a field which pervades the entire law, and is so interlocked at every point with property, contract and other accepted classifications that, as the student of the law soon discovers, the categories are quite arbitrary.")

Instead, we accept as persuasive the holdings in *Blatstein* and *Tiab* that prejudgment interest is available as a post-trial remedy in a UFTA claim. *See Blatstein*, 260 B.R. at 721 (discussing Pennsylvania's "flexible approach" to deciding prejudgment interest awards in novel contexts) (citing *Murray Hill Estates, Inc. v. Bastin*, 276 A.2d 542, 545 (Pa. 1971)). The Muse Defendants, relying on a case from 1919, insist that prejudgment interest in non-contract claims are a question for the jury's determination. *See Philadelphia Drying Machinery Co.*, 56 Pa. Super. At 31. However, their more recent relied-upon authority itself suggests that "the decided trend of courts of law and courts of equity has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case." *Robert Wooler Co.*, 479 A.2d at 1036 (quoting *McDermott v. McDermott*, 196 A. 889, 890 (Pa. Super. 1938)). Indeed, in *Robert Wooler Company*, the Superior Court made no determination as to whether post-trial prejudgment interest would have been appropriate; rather, the Superior Court remanded simply because the trial Court failed to make any on-record justification of the award whatsoever. *See* 479 A.2d at 1036-37.

Having determined that a successful claimant in a UFTA action may be awarded prejudgment interest in a general sense, we initially note that the Parties have tendered little in the way of argument as to why prejudgment interest might or might not be appropriate in the instant case. Unlike in most contract cases, where the amount of damages is liquidated at the time of the accrual of the action (and accordingly prejudgment existence may be had as a matter of right), in non-

23

contract cases prejudgment interest is an equitable remedy awarded at the discretion of the trial court. *Blatstein*, 260 B.R. at 721 (citing *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assoc.*, 685 A.2d 141, 148 (Pa. Super. 1996)). "In cases where there is no controlling precedent, the Pennsylvania Supreme Court has encouraged courts to take a flexible approach in deciding whether to award prejudgment interest." *Blatstein*, 260 B.R. at 721 (citing *Murray Hill Estates, Inc. v. Bastin*, 276 A.2d 542, 545 (Pa. 1971)). Whether such an award is appropriate is guided by the following four factors: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; (4) whether countervailing equitable considerations militate against a surcharge. *Tiab*, 263 F.Supp.2d at 947 (citing *Feather v. United Mine Workers*, 711 F.2d 530, 540 (3d Cir. 1983)). Having considered these factors, we make the following findings:

1. The Plaintiffs have diligently prosecuted this action. While this case has been the subject of roughly one-and-a-half decades' litigation, this delay has been largely the result of the Gold Defendants' dilatory discovery practices. *See Drone Technologies, Inc. v. Parrot S.A.*, 2015 WL 3756318, *11 (W.D. Pa. 2015) ("Plaintiff has been diligent in prosecuting the action despite Defendants' dilatory actions").

2. The Muse Defendants have undoubtedly been unjustly enriched by the transfer which was the subject of the UFTA claim, in light of the jury's verdict. *See Calbex Mineral Ltd. v. ACC Resources Co., L.P.*, 90 F.Supp.3d 442, 467-68 (W.D. 2015) ("To the extent defendant has had the free use of the income-producing ability…without having to pay for it, he has been unjustly enriched. To divest defendant of this unjustified benefit is not to penalize him, for it has been determined by the trial that it was never rightfully his") (citing *Feather*, 711 F.2d at 540).

3. Interest is compensatory in light of the fact that the transfer in question (*i.e.*, the purchase of STO at the sheriffs' sale) deprived the Plaintiffs the ability to work at STO and make money off of the Hanson contract in the

24

interim. *Cf. Calbex Mineral Ltd.*, 90 F.Supp.3d at 468 (citing *Bradford-White v. Ernst & Whinney*, 1990 WL 48305, *4 (E.D. Pa. 1990)).

4. Here, we find there is one principal countervailing equitable consideration that militates against a surcharge: namely, it has primarily been the conduct of the Gold Defendants, rather than the Muse Defendants, which has resulted in the substantial delay of this case. *Cf. Drone Technologies*, 2015 WL3756318 at *11 (holding a defendant who themselves caused the delay responsible for delay damages).

*See Feather*, 711 F.2d at 540. Accordingly, we find that an award of prejudgment interest is appropriate. However, in light of the countervailing equitable consideration we have identified (*i.e.*, that Muse Defendants are less responsible for the case's delay than are the Gold Defendants), we will accept the Muse Defendants' invitation to surcharge them at a rate lower than the maximum statutory interest rate of 6%. *See* Muse Defs. Br. in Opposition, 15-16 (noting that statutory rate is the *maximum allowable* rate and not necessarily mandatory); *See also* 41 P.S. § 202. Under the circumstances, we find that an award of prejudgment interest at the rate of 3% prejudgment interest is appropriate.

Opinion of Court dated June 13, 2016, pp. 27-41. In light of the foregoing, we find that our award of prejudgment interest on the Plaintiffs' UFTA claim was appropriate, and as such we believe that the Muse Defendants' twelfth issue is without merit.

The Muse Defendants' issues thirteen and fourteen are general allegations of error that take exception to this Court's denial of JNOV and summary judgment ("Did the Court err by not vacating the judgments entered against the Defendants?" and "Were the judgments entered against the Defendants supported by sufficient evidence?"). Muse Defs.' Concise Stat. ¶¶ 13-14. Given the foregoing analysis of our previous determinations during both the summary judgment and post-trial stage of proceedings, we will not herein address these catch-all assertions of error with any further particularity.

25

For the foregoing reasons, we determine the Muse Defendants' assignments of error to be without merit and respectfully request that the judgment rendered against them be affirmed.

## III

The Gold Defendants raise seven (7) issues on appeal. We address these assignments of error *seriatim*, analyzing certain issues together where it is sensible to do so.

The Gold Defendants' first issue assigns error to this Court's imposition of sanctions against the Gold Defendants on August 4, 2010, again on March 20, 2011, and most significantly on November 26, 2012, Gold Defs.' Conc. Stat. ¶1.[8] The assertion of error, reproduced verbatim, is that:

> The evidence did not establish that each of the Defendants wrongfully and willfully failed to respond to discovery requests or, respecting documents that they possessed which were responsive to discovery requests, that each failed to make such documents available for inspection, or that each withheld those documents from production. In this regard, the evidence did not establish that each of these Defendants possessed but withheld documents that the court had ordered to be produced. The nature and severity of the sanctions were excessive and not supported by the facts or the law.

Gold Defs.' Concise Stat. ¶1.

The increasing range of sanctions imposed against the Gold Defendants were initiated by the Court's Order of December 27, 2007, wherein we disposed of a Motion to Compel by the Plaintiffs and ordered the Defendants to (1) serve full and complete Answers to the Interrogatories, (2) serve a response to a Request for Production of Documents, and (3) make fifteen specified boxes of documents available to the Plaintiff for inspection and copying on or before January 25, 2008. *See* Opinion and Order dated August 3, 2010 (entered August 4, 2010).

---

[8] The Gold Defendants also assign error to this Court's refusal to revisit those decisions in our June 13, 2016 Order. Gold Defs.' Concise State. ¶1.

26

The Gold Defendants failed to comply with the terms of this Court's December 27, 2007 Order, prompting the Plaintiffs to file a Motion for sanctions on September 2, 2008. On December 31, 2008, this Court issued a second Order, again directing the Gold Defendants to serve full and complete answers to the Plaintiffs' Interrogatories, serve a response to the Plaintiffs' Request for Production of Documents, and to make the same specific documents available to the Plaintiffs for inspection or copying, this time affixing a deadline of March 2, 2009. The December 31, 2008 Order impressed upon the Gold Defendants the import of complying with the Court's discovery Orders via the following warning:

> If the Gold Defendants fail to [comply with the terms of this Order], upon motion, this Court will issue appropriate sanctions, which may include dismissing the remaining counterclaims of the Gold Defendants, and precluding evidence of all affirmative defenses or in support of new matter as set forth in the Answer, New Matter and Counterclaim of the Gold Defendants.

Order of Court dated December 31, 2008, at ¶¶ 1-3. The Plaintiffs filed a Motion for Sanctions on April 19, 2010, alleging that the Gold Defendants continued to operate in defiance of this Court's previous discovery Orders. In granting the Plaintiffs request, we noted that Pa. R.C.P. 4019 allows for sanctions when:

> (i) a party fails to serve answers, sufficient answers or objections to written interrogatories under Rule 4005;
> ***
> (vii) a party, in response to a request for production made under Rule 4009, fails to respond that inspection; or
> (viii) a party otherwise fails to make discovery or to obey an order of court respecting discovery.

*See* Order of Court Dated August 3, 2010 at unnumbered pages 2-3. Rule 4019 further provides that in the event sanctions are warranted, such sanctions may include:

> (1) an order that the matters regarding which the questions were asked, or the character or description of the thing or land, or the contents of the paper, or any other designated fact shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

27

(2) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony, or from introducing evidence of physical or mental condition;

(3) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or entering a judgment of non pros or by default against the disobedient party or party advising the disobedience;

\*\*\*

(5) such order with regard to the failure to make discovery as is just.

Pa. R.C.P. 4019(c); *See also* Order of Court dated August 3, 2010 at unnumbered page 3. In deciding to impose sanctions on August 3, 2010, we noted that the decision to sanction a party for a discovery violation and the severity of the sanction are vested in the sound discretion of the trial court. *Judge Technical Services, Inc. v. Clancy*, 813 A.2d 879, 889 (Pa. Super. 2002). A trial court should not impose sanctions for failure to allow discovery unless a party has disregarded or disobeyed a court order. *Stern v. Vic Snyder, Inc.*, 473 A.2d 139, 146 (Pa. Super. 1984). Moreover, we noted that our analysis was guided by the following five factors: (1) the nature and severity of the discovery violation, (2) the defaulting party's willfulness or bad faith, (3) prejudice to the opposing party, (4) the ability to cure the prejudice, and (5) the importance of the precluded evidence in light of the failure to comply. *Judge Technical Services*, 813 A.2d at 889. We applied these factors as follows:

(1) **The nature and severity of the discovery violation** is such that Defendants have violated two court orders, resulting in a two year delay in getting the documents to the Plaintiffs.

(2) **The defaulting party's willfulness or bad faith** does not seem to be notably egregious in this case. While the Defendants are not in compliance with the court order, they did serve answers, albeit incomplete ones to the [Plaintiffs'] Interrogatories, and both parties concede that the Defendant did make attempts, albeit inconvenient and possibly inappropriate, to create a situation where the Plaintiffs could review the documents.

(3) **The prejudice to the opposing party** is significant. The Plaintiffs assert that the documents which they have not been permitted to access include information related to specific multi- million dollar contracts. These contracts are the basis for this action, and it was the securing of the contracts that the Plaintiffs allege spurred the majority shareholder Defendants to conspire to freeze the minority

28

shareholder Plaintiffs out of the corporation. The documents at issue include how the price per share for the corporation was calculated, without which the Plaintiffs do not have the means necessary to calculate a figure for damages.
(4) **The ability to cure prejudice** is possible if the Gold Defendants would comply with a future order of the court, although they have proven reluctant to do so. The two year delay, however, has already hampered the successful completion of this matter.
~~(5) The importance of precluded evidence is significant, as the documents detail~~ the contracts which are the subject matter of the possible freezing out of the minority shareholders in this matter.

Order of Court dated August 3, 2010 at unnumbered pages 5-6. Accordingly, the Court again directed the Gold Defendants to comply with the requirements of our December 31, 2008 and December 27, 2007 Orders, this time allowing the Gold Defendants thirty (30) additional days to comply. We moreover imposed the sanctions contemplated in the Court's December 31, 2008 Order; namely, we (1) dismissed any remaining counterclaims levied by the Gold Defendants, (2) precluded the Gold Defendants from introducing evidence relating to certain affirmative defenses or in support of their New Matter. Order of Court dated August 3, 2010 at unnumbered pages 6-7.

Following our Order of August 3, 2010, the Plaintiffs filed a Motion to Hold Defendants Dennis and Bonny Gold in Contempt and Motion for Attorney Fees on January 19, 2011. After conducting argument thereon, this Court granted the Plaintiffs' Motion on March 29, 2011 (entered March 30, 2011). In so doing, our analysis of the five-factor *Judge Technical Services* test was substantially identical to that contained in our August 3, 2010 Order. We largely accepted the Plaintiffs' allegations that, *inter alia*, "despite clear and unequivocal court orders to provide discovery which they have evaded for nearly four years, Gold Defendants persist in failing to produce documents critical to Plaintiffs' prosecution of this case[,]" and that the "Gold [Defendants'] responses or lack thereof during the discovery process is a transparent effort to make it as expensive, burdensome and confused as possible." Order of Court dated March 29,

29

2011 at unnumbered page 3. Specifically, we found that the Gold Defendants' offer to tender the documents to the Plaintiffs by allowing the Plaintiffs to review "over twenty boxes at Cherrytree Mini Storage, [which] contains no electricity, where [the Gold Defendants] would be willing to open the storage unit at a reasonable time" was "inconvenient and possibly inappropriate." *Id.* at unnumbered pages 3-5. We moreover noted their continuing refusal to answer certain interrogatories despite having been specifically ordered to do so on three separate occasions spanning nearly four years. *Id.* at unnumbered page 3. Accordingly, we found the Gold Defendants in contempt, allowing them to purge themselves of contempt by producing all of the documents in question within twenty (20) days, and moreover required that they pay $1,000.00 in attorney fees. *Id.* at unnumbered page 3-6.

On September 8, 2011, the Plaintiffs filed a Motion to Enforce Contempt and for Additional Sanctions and for Attorney Fees. Argument and an evidentiary hearing were held thereon. On November 26, 2012, we granted the Plaintiffs' Motion, and in so doing, rendered the following factual findings:

> On April 13, 2011, as a result of the March 29, 2011 Order of Court, the Gold Defendants forwarded via Federal Express a letter, a check for $1,000.00 and four large boxes of documents. Upon review of the documents, both by Plaintiffs' counsel and the Plaintiffs, it appeared that a large amount of the documents produced in those four boxes were in fact documents that the Plaintiffs had previously produced to the Gold Defendants and that none of the documents were those ordered to be produced. Plaintiffs prepared an index of the documents produced when they reviewed the boxes, which was admitted into evidence during the evidentiary hearing. Following review of the documents contained in the boxes, Plaintiffs' attorney advised Mr. Gold, via letter dated July 12, 2011, that he had failed to purge himself of contempt and that he was providing Mr. Gold with an additional ten days to comply. Mr. Gold then responded via letter dated July 28, 2011 stating that he had sent a second April 13, 2011 letter that did comply with the March 29, 2011 Order of Court. On October 17, 2011, Mr. and Mrs. Gold filed a verified response to the Motion to Enforce Contempt, entitled Response/Brief in Opposition of Motion for Sanctions. The Gold Defendants testified as to the existence of the second April 13, 2011 letter and indicated that it was attached as Exhibit E. However, there was no Exhibit E attached to the

30

response and none was ever produced either at the argument or at the hearing. Eventually, during the April 9th, 2012 hearing, Mr. Gold admitted that there was no second April 13, 2011 [letter]. In a later letter sent in October of 2011, Gold Defendants asserted that the documents that they had been ordered to produce were designated by "blue sheet" dividers with writing explaining what documents followed. The Gold Defendants attempted to prove this via their son's testimony and the testimony of Ashley Baker during the evidentiary hearing. This assertion is in contradiction to the July 28, 2011 letter stating that the "second" April 13, 2011 letter did the same thing. During the evidentiary hearing, Mr. Gold testified that the Answer to the Frey Parties' first set of interrogatories and request for production of documents was the "second" April 13, 2011 letter he had previously asserted had complied with the Court's Order directing them to label documents which provided answers to Interrogatories 1, 3, [and] 5. However, when questioned further, Mr. Gold admitted that specific Answer was verified and prepared in 2010, before the most recent Court Order directing him to clearly identify the documents when produced. Next the Gold Defendants asserted at the first evidentiary hearing that they forwarded a July 20, 2011 letter to [Plaintiffs'] counsel that complied with the March 29, 2011 Order, which offered Plaintiffs an opportunity to meet. However, when pressed further about the letter, Mr. Gold stated that it had never actually been sent and instead was redrafted by an attorney and was essentially the July 28, 2011 letter allegedly containing similar content that was sent to [Plaintiffs'] counsel. However, the July 28, 2011 letter relies wholly upon the now established as never existent "second" April 13, 2011 [letter]. After review of the document during testimony at the evidentiary hearings, the content was not substantially similar. In all, Gold Defendants have attempted numerous times to fabricate documents or utilize documents already in existence in an effort to prove they have purged themselves of contempt. The Gold Defendants have to this day failed to produce any documents relating to the stock value determination of $7.64 per share, despite Mr. Gold testifying at his deposition that he prepared the computations, have failed to produce STO's billings and receivables and STO receipts and payment, have failed to produce general ledgers and bank statements and have failed to produce the Hanson invoices, including audit information, after Defendant Charles Muse, in his deposition, confirmed that the documents did exist and that they were prepared in Franklin, Pennsylvania, where Mr. Gold performed his work for the Muse Defendants.

Prior to the March 29, 2011 Order, the Gold Defendants and Plaintiffs' counsel had repeatedly corresponded directly regarding the documents ordered to be produced. By letter dated March 12, 2009, Plaintiffs' counsel wrote to the Gold Defendants "To the extent these documents are not in your possession, please so advise." In a written response, the Gold Defendants did not so advise but instead stated that counsel should "bring a flashlight, and a generator" to review thirty boxes in an unlit storage facility. At no time, prior to the current Motion did the Gold Defendants assert that they do not have the documents and it is not clear from the record whether they assert that these documents never existed, were lost, were destroyed or are simply not being produced....

31

The Gold Defendants did not comply with the December 27, 2007 Order, the December 31, 2008 Order, the August 3, 2010 Order and finally the March 29, 2011 Order. The Gold Defendants produced to the Plaintiffs a check for $1,000.00[.] [However,] they have continued to fail to produce the documents requested by Plaintiffs and ordered by the Court. The Court notes that the Gold [Defendants] now claim that they do not and never had the documents sought by the Plaintiffs. However, the Court also notes that the last three Court Orders that sanctioned the Gold Defendants were for not producing such documents and if the documents were not in the Gold Defendants' possession then they should [have] so pled. Furthermore, the Gold Defendants at no time, despite being directly asked by Plaintiffs, informed the Plaintiffs...that they were not in possession of the Hanson invoices. Therefore, the Gold Defendants have violated not only one, but four Court Orders, making sanctions appropriate in this case.

Opinion of Court dated November 26, 2012 at unnumbered pages 4-8. We then applied our

findings to the previously-discussed five-factor test contained in *Judge Technical Services* for

assessing requests for sanctions as follows:

[1] **The nature and severity of the discovery violation** is such that Gold Defendants have not only violated four Court Orders, resulting in almost a five year delay in getting the requested documents to the Plaintiffs that they apparently now state they never had, but they have also misled the Plaintiffs through five years of discovery motions costing them a substantial amount of money in the pursuit of documents and have wasted the Court's time for the past five years by conducting argument on discovery motions related to these documents.

[2] **The defaulting party's willfulness or bad faith** can be viewed to be notably egregious in this case. As stated hereinbefore, the Gold Defendants have led the Plaintiffs through five years of discovery motions costing them significant and repeated expense in search of documents that they now assert they never had, they submitted false verifications and testimony at the hearings, they have failed to produce computations that Mr. Gold himself testified at deposition that he prepared for the $7.64 share value and they misled the Court by attempting to pass off interrogatory answers filed in 2009, and modified in 2010, which themselves were found inadequate even then, as a current attempt to comply with the previous Order. For an unknown reason and despite request from the Plaintiffs, the Gold Defendants apparently felt it unnecessary to inform either the Plaintiffs or the Court of the fact that they did not have the documents being sought.

[3] **The prejudice to the opposing party is significant.** The Plaintiffs assert that the documents which they have not been permitted to access included information related to specific multi-million dollar contracts. These contracts are the basis for this action, and it was the securing of the contracts that the Plaintiffs allege spurred the majority shareholder Defendants to conspire to freeze the minority shareholder Plaintiffs out of the corporation. The documents at issue

32

include valuable information which would assist the Plaintiffs in establishing the value of the business from which Plaintiffs assert that they were improperly excluded. Without the proper documentation on how the price per share for the corporation was calculated, the Plaintiffs do not have the means necessary to calculate a figure for damages.

[4] **The Gold Defendants do not possess the ability to cure the prejudice** as they now assert that they do not have the documents to produce. Therefore, they would not be able to provide to the Plaintiffs the documents they have been requesting for the past five years that would provide the basis for the damages in their action. The Court notes that it was determined during the evidentiary hearing that the necessary discovery could be collected by conducting a deposition of Hanson Aggregates West, Inc., in Texas, which was previously requested by Plaintiffs and granted by the Court. However, the Court finds that the Plaintiff's decision not to subpoena the Hanson corporation does not in any way purge the Gold Defendants of contempt as it would have cost the Plaintiffs an upwards of $10,000 for documents that they were being led to believe existed in either Pittsburgh, Pennsylvania or Franklin, Pennsylvania.

[5] **The importance of the precluded evidence is significant.** The STO's billings and receivables, STO's receipts and payments would be offered by the Plaintiffs to establish that STO had sufficient billings and receivables to satisfy the indebtedness to the Muse Defendants, proving further that the Sheriff's sale was not a legitimate judgment execution. The general ledgers and bank statements would be offered to establish that the Muse Defendants returned assets of STO to the Gold Defendants from which they received money after the Sheriff's sale as further payment for the Golds' cooperation in the conveyance of the Hanson contract and STO business at the execution sale. The Court finds that the Gold Defendants have been granted multiple opportunities to comply with its orders [and] despite being repeatedly warned by this Court of the consequences of their misconduct, have instead chose to misrepresent and verify untrue statements.

Opinion of Court dated November 26, 2012 at unnumbered pages 8-10 (emphasis added).

Consistent with the findings and analysis contained in our November 26, 2012 Opinion, that same date this Court Ordered as follows:

1. Judgment is entered in favor of Plaintiffs and against Dennis Gold, Bonny Gold, Slurry Technologies Operating, LLC ("STO") and Slurry Technologies, Inc. ("STI") on all claims included in this consolidated proceeding;

2. Evidence of expenses incurred in performance of the Hanson contract is hereby excluded at trial;

3. It is hereby deemed as established that STO received monies from contracts and assets of STO returned to it subsequent to the Sheriff's Sale of December 19, 2001;

33

4. It is hereby deemed as established that STO's billing to Hanson and outstanding receivables were adequate to satisfy any indebtedness to Pilgrim as of the date of the Sheriff's Sale of December 19, 2001;

5. It is hereby deemed as established that the value of STO immediately prior to the Sheriff's Sale was at a minimum $7.64 per share of all shares to be issued and outstanding.

6. Dennis and Bonny Gold must pay attorney fees in the amount of ~~$10,000.00 to Plaintiffs within 30 days of this Order.~~

Order of Court dated November 26, 2012. A review of the record leaves this Court comfortable that our factual determinations surrounding the Gold Defendants' discovery conduct were sufficiently supported by the testimony and other evidence, and moreover that our application of the law governing requests for discovery sanctions was measured and reasonable. As such, we find the Gold Defendants' first issue to be without merit.

The second issue raised by the Gold Defendants differs from the first only insofar that it asserts our sanctions should not have been entered against Bonny Gold specifically. Gold Defs.' Concise Stat. ¶ 2. We find this assignment of error unavailing for three reasons. First, the Gold Defendants' failure to distinguish between the prejudice suffered by the Gold Defendants generally and Bonny Gold specifically prior to their filing a post-trial motion results in waiver of the issue under Pa. R.C.P. 227.1(b)(1). Second, as we stated in disposing the Gold Defendants' post-trial motions, Bonny Gold's assertion that "her own involvement with the company was limited" was not relevant to our determinations with respect to discovery sanctions, which only contemplated her involvement *with the litigation*, and not "the extent to which [she] may or may not have been involved with day-to-day business operations." Opinion of Court dated June 19, 2016. Third, we reject on its own terms the argument that Bonny Gold's participation in the discovery process was such that she should have been spared where Dennis Gold was not. *See, e.g.*, Opinion of Court dated November 26, 2012 at unnumbered page 5 (noting that "Mr. and Mrs. Gold filed a verified response" to the Plaintiffs' Motion to Enforce Contempt, and

34

otherwise describing the "Gold Defendants" as participating in discovery coextensively) (emphasis added). We therefore find that the Gold Defendants' second issue is without merit.

The Gold Defendants' issues three through six, which we consider together, are as follows:

3. It is respectfully submitted that his Honorable Court erred in its denial of Defendants' motion for post-trial relief because the jury award was excessive, punitive, and based on speculative evidence. This Honorable Court erred by directing the jury to award separate damages for civil conspiracy in favor of Plaintiffs, John and Elaine Frey, and that this award had to be calculated based upon the dollar value of Defendant, Slurry Technologies Operating, LLC, as of December 19, 2001, and that this value could not be less than $7.64 per share of stock. *See, Verdict* ¶22. The damages arising from a civil conspiracy that was formed to engage in tortious conduct are duplicative of the awards entered for the damages allegedly arising from the same tortious conduct that formed the foundation of the alleged conspiracy. An alleged conspiracy is not actionable independent of the underlying claims. To the contrary, the damages recoverable on the conspiracy claim are the same damages recoverable for the underlying torts. There can be only one recovery for these damages.

4. It is respectfully submitted that this Honorable Court in its denial of Defendants' motion for post-trial relief because the jury award was excessive, punitive, and based on speculative evidence as a result of this Honorable Court's direction or permission for the jury to enter a separate award for intentional interference with contractual relations, *(Verdict* ¶13) even though these alleged damages are duplicative of the damages that were awarded for the alleged breaches of the very same contracts. The damages allegedly arising from the intentional interference claim are not different from the damages for the breaches of contract. There can be only one recovery for these damages.

5. It is respectfully submitted that this Court erred in its denial of Defendant's motion for post-trial relief because the jury ward was excessive, punitive and based on speculative evidence as a result of this Honorable Court's direction that the jury was to enter a separate award to Plaintiffs, Robert G. Frey and Sue Frey, and against the Defendants for civil conspiracy and by directing that the minimum amount of the award could be no less than the amount under the demand note. *Verdict* ¶23. The jury should have been permitted to determine the amount of their award, if any, without such a restriction. The amount awarded is not supported by any evidence. Moreover, the damages recoverable under the alleged conspiracy to breach promises to pay the demand note are not different, and cannot be greater, than the damages arising from the failure to pay the note, which amount was also awarded *(Verdict* ¶1). Conspiracy is not independently actionable. There can only be one recovery for these damages.

6. It is respectfully submitted that this Honorable Court erred it its denial of Defendant's motion for post-trial relief because the jury award was excessive,

punitive and based on speculative evidence as a result of this Honorable Court's direction to the jury to enter an award in favor of Plaintiffs, John and Elaine Frey, on the claim of fraudulent misrepresentation as these damages were duplicative of the damages awarded for other alleged torts as set forth in the verdict form ¶¶1-6, 13, 22-23. There can only be one recovery for those damages.

Gold Defs.' Concise Stat. ¶¶3-6. Rather than address the substance of these issues, we believe it enough to say they have been waived under Pennsylvania Rules of Civil Procedure 227(b), 227.1(b)(1) and 227.1(b)(2). Rule 227, which governs Exceptions taken during trial, reads as follows:

> (a) It shall not be necessary on the trial of any action or proceeding to take exception to any ruling of the trial judge. An exception in favor of the party against whom the adverse ruling was made shall be deemed to have been taken with the same force and effect as if it had been requested, noted by the official stenographer and thereafter written out, signed and sealed by the trial judge.
> (b) Unless specially allowed by the court, **all exceptions to the charge to the jury shall be taken before the jury retires.** On request of any party all such exceptions and arguments thereon shall be made out of hearing of the jury.

Pa. R.C.P. 227 (emphasis added). Additionally, under Rule 227.1(b)(1), a court may not grant a request for post-trial relief unless the grounds therefor, "if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial." With respect to the Gold Defendants' issue three, the Gold Defendants failed to object to the instruction on civil conspiracy either during the discussion surrounding the Points for Charge or after the charge was given. *See* Trial Tr. Day 6 at 226-241. With respect to the Gold Defendants' issue three, the Gold Defendants failed to object to the instruction on intentional interference with contractual relations either during the discussion surrounding the Points for Charge or after the charge was given. Tr. Day 6 at 208-215. With respect to the Gold Defendants' issue five, the Gold Defendants failed to object to the instruction on civil conspiracy either during the discussion surrounding the Points for

36

Charge or after the charge was given. Tr. Day 6 at 226-241. Finally, with respect to the Gold Defendants' issue six, the Gold Defendants failed to object to the instruction on fraudulent misrepresentation either during the discussion surrounding the Points for Charge or after the charge was given. Day 6 at 215-226.[9]

Moreover, Rule 227.1(b)(2) states that post-trial relief may not be granted unless the grounds therefor "are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds." The Gold Defendants failed to lodge any of these precise arguments in their request for post-trial relief, and as such we had no occasion to consider them in our post-trial Opinion and Order. *See* Opinion of Court dated June 19, 2016 at 7-11. We therefore find them to be waived, and accordingly we find the Gold Defendants' issues three through six to be without merit.

The Gold Defendants' final issue assigns error to our award of prejudgment interest on the Plaintiffs' breach of contract claim:

> 7. It is respectfully submitted that this Honorable Court erred in its June 13, 2016 order by molding the verdict to include an award for prejudgment interest against the Defendants, Dennis Gold and Bonny Gold, on the breach of contract claim (*Order 6/13/16, ¶3(c)*) as the jury did not find that these Defendants were liable for this breach of contract claim (*Verdict ¶5*).

Gold Defs.' Concise Stat. ¶7. We initially note that the Gold Defendants' concise statement misstates the matter somewhat; the jury could not "find that these Defendants were liable for this breach of contract claim," because any issue relating to the liability of the Gold Defendants was foreclosed by this Court's November 26, 2012 Order imposing

---

[9] The Gold Defendants' objection to the Plaintiffs' proposed fraudulent misrepresentation charge was limited to their wanting to clarify to the jury that their liability was foreclosed according to this Court's discovery sanctions, and not the result of some finding of fact. Trial Tr. Day 6 at 226-241.

sanctions. The jury merely made a determination as to the amount of damages. *See* Verdict ¶5. In any event, the Gold Defendants are correct that the verdict reflects that it is only STO that was held liable for the breach of contract claims, and accordingly our June 16, 2016 Order should not have awarded prejudgment interest against Dennis and Bonny Gold. However, the Plaintiffs' praecipe to enter judgment reflects that judgment on the breach of contract claims (including this Court's award for prejudgment interest therefor) was only actually entered against STO. *See* Plaintiffs' Praecipe to Enter Judgment Pursuant to Pa. R.C.P. 227.4(2) at 2, ¶3(a). As such, the error instantly complained of is entirely harmless. *See Hart v. Arnold,* 884 A.2d 316, 325 n.2 (Pa Super 2005) ("an appeal properly lies from the entry of judgement, not from the order denying post-trial motions); *See also* 17 Std. Pa. Prac.2d § 92:87 (judgment entered upon a jury's verdict should not be disturbed where the trial judge's otherwise proper denial of post-trial motions contains erroneous reasoning) (citing *Brown v. McLean Trucking Co.,* 256 A.2d 606, 607 (Pa. 1969); *Carpenter v. City of Lancaster,* 61 A. 1113 (Pa. 1905)). As such, we do not find any merit in the Gold Defendants' seventh assertion of error. We find that judgment in this respect should be affirmed.

## IV

For the foregoing reasons, it is respectfully submitted that this Court's rulings were free from error and that the judgment entered in favor of the Plaintiffs, in accordance with the jury's verdict and our June 16, 2016 Order, should be affirmed.

BY THE COURT,

Oliver J. Lobaugh, President Judge

38